**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cause No. 1:22-CR-27 |
| | ) | |
| MARCUS J. ROZIER | ) | |

**OPINION AND ORDER**

When the jig's up, it's up. Defendant Marcus Rozier learned this as he led police on a 100-mph vehicle chase through LaGrange County, Indiana. Rozier lost control of the vehicle, it became airborne, and rolled end over end resulting in the death of one passenger. But the horrific accident, captured on dash cam footage, is not what spawned the ten-count superseding federal indictment against Rozier. It was what occurred before the chase that led to his indictment on five counts of bank fraud (or aiding and abetting in bank fraud), in violation of 18 U.S.C. §1344(2), and five counts of aggravated identity theft, in violation of 18 U.S.C. §1028A(a)(1) and 18 U.S.C. §2. (Superseding Indictment, ECF No. 117).

Before the Court are many motions, all stemming from Rozier's jury trial and that jury's convictions on all ten counts. From the Defendant, the Court has pending before it: Motion for Release of Brady Materials and for Discovery under the Jencks Act (ECF No. 160), Supplemental Motion for Release of Brady Materials (ECF No. 217), First Motion for New Trial and Renewed Motion for Judgment of Acquittal (ECF No. 217) and, Motion Contesting 18 U.S.C. §1028A(a)(1)'s Constitutionality (ECF No. 240). After briefing concluded on all these motions, the Government moved to Supplement Briefing Based on Newly Discovered Information (ECF No. 274), which resulted in additional filings by the parties to address the newly discovered information. Most recently, the parties filed a stipulation concerning the facts

surrounding discovery in *State of Indiana v. Rozier*, 44C01-2201-FC-1 (LaGrange Circuit Court), the state case resulting from the death of the Defendant's passenger in the chase (ECF No. 322). The Defendant then supplemented the stipulation (ECF No. 323). The parties have extensively briefed all motions and issues (ECF Nos. 228, 241, 247, 258, 274, 291, 297-98, 300, 316).

Although the Court finds the verdicts were amply supported by the evidence at trial, because the Court finds that the Government unintentionally engaged in discovery violations by failing to turn over materials required under the Jencks Act and potentially exculpatory materials in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), the Court concludes that the Government's discovery violations prejudiced the Defendant's trial. Accordingly, the Defendant's Motion for a Judgment of Acquittal will be DENIED but the Motion for a New Trial under Fed. R. Cr. P. 33 will be GRANTED. The Motion for Release of Brady Materials and for Discovery under the Jencks Act and the Supplemental Motions will be DENIED as MOOT (ECF Nos. 160, 217). Defendant's Motion Contesting 18 U.S.C. §1028A(a)(1)'s Constitutionality (ECF No. 240) will be DENIED.

## DISCUSSION

### a. *Background and Trial Evidence*

In October 2022, Rozier was charged for his role in an all-too-common fraudulent check cashing scheme. The Government's theory of the scheme developed throughout a four-day trial. As the Government explained it, Rozier took part in various components of the operation that began with the would-be fraudsters (Rozier appears to be one of several) obtaining checks from one or more third parties that had been stolen from rural mailboxes. There was no evidence that Rozier personally participated in those thefts, but once the checks had been stolen, the evidence did show that Rozier recruited other individuals to cash the stolen checks (collectively

"Cashers"). Once he recruited the Cashers, he would take photos of their identification cards on his phone and text that information to another individual. That individual then altered the stolen checks to appear as if they had been written to the Casher. Rozier provided transportation for the Cashers to the various banks where the checks were drawn. Upon the successful cashing of a check, he would distribute a portion of the proceeds from the fraudulent checks among the Cashers.

All went smoothly the first two days of trial as the Government put on its case in chief. The Government began its presentation with the victims of the stolen checks. Richard Bontrager, Kenneth Otto, Ryan Petersheim, Janelle Petersheim, Rodney Parker, and Merle Neff (collectively, the "Victims"), all testified that they received notice of fraud from their banks. In each case, the Victims testified that they had not written checks payable to the Cashers and all testified that they were unaware that their checks had been stolen until notified by the banks. The Victims did not know Rozier and had not seen him before their testimony in court.

After setting this background, the Government presented witnesses Derrickal and April McBride.[1] (Derrickal McBride Tr. Testimony, ECF No. 324, "Derrickal Test. at ___"; April McBride Tr. Testimony Day 2, ECF No. 325, "April Day 2 Test. at ___"). Derrickal testified he met Rozier on January 12, 2022, when Rozier "rolled up" on him in a maroon minivan seeking to recruit him to "make some money." (*Id.* at 12). Although Derrickal was working through a temp agency at the time, his wife was unemployed and he testified money was tight. (*Id.* at 4). Rozier told Derrickal he was looking for individuals with two forms of identification looking to earn money. Derrickal did not have two identification forms but told Rozier that his wife, April, did. (*Id.*). The two exchanged cell numbers and later that day Derrickal spoke with April about

---

[1] April was charged, along with Christopher Cass and Jamal Johnson, in the original indictment for their roles in the check cashing scheme. (ECF No. 1). Rozier's indictment was superseded after all three of these individuals pleaded guilty.

participating in the money-making scheme. (*Id.* at 13). At some point, Derrickal texted Rozier to tell him April would help him and provided Rozier with their address at East Central Towers in Fort Wayne.

The next day, January 13, a black male arrived at East Central Towers in a dark colored van accompanied by two black male individuals to pick up April. (April Day 2 Test. at 9-10). April testified that she cashed checks as part of the scheme on both January 13 and January 14. April stated that she referred to the driver of the van as "driver" and she added the cell number given to her by Derrickal (470-838-9314) in her own cell phone and labeled the contact "work." (*Id.* at 8). She also testified that the driver was the same person on both January 13 and January 14. (*Id.* at 12). But on direct examination, April testified that she recognized no one in the courtroom as the driver. (*Id.* at 11). This is where things began to go south for the Government.

Apparently caught off guard by April's testimony, the Government tried to reference cell phone evidence from April's cell phone to show that April was talking to Rozier on the date and time she was being picked up to cash checks. This prompted a defense objection because the Government had presented no evidence linking Rozier to the cell phone number that April was texting. After sustaining the objection, the Court permitted the Government to "temporarily suspend" April's testimony to allow the Government to introduce foundational cell phone evidence through another witness linking the cell phone evidence to Rozier.

Prior to the third day of trial, the Government requested to recall April after April approached Government counsel at the end of day 2 to tell counsel she misunderstood the identification question posed to her during her direct examination. The Court permitted April to retake the stand and defense counsel to voir dire her. After hearing the voir dire examination, the Court agreed to permit the Government to attempt to rehabilitate April's non-identification when

the Government recalled her. (April McBride Tr. Testimony Day 3, ECF No. 216, "April Day 3 Test. at ___"). When recalled, April testified that she misheard or misunderstood Government counsel's question about whether the driver of the van was in the courtroom. When asked again, April identified Rozier as the driver. (*Id.* at 29).

April's testimony continued with her recounting the events leading to her cashing checks. She testified that after he picked her up, Rozier gave her instructions. He took a photo of her ID and social security card and sent it to someone by text. On January 13, April testified that they drove to a Family Dollar on Pontiac street and picked up checks from an older lady Rozier said was his aunt. (April Day 3 Test. at 31-32, 79-80: "We drove from [East Central] Towers to Family Dollar on Pontiac.").[2] The front seat passenger got out, retrieved the checks from another

---

[2] There is some suggestion that April testified they drove to a house on Pontiac Street to pick up the checks. On Day 3 of the trial, defense counsel represented to Detective Martin that on direct examination April testified that they went to a house. (Day 3 Tr., ECF No. 216 at 175). The Court also said during oral argument on Day 4 that it believed, without the benefit of a transcript, April mentioned going to a house during her testimony. (ECF No. 194 at 20). The Court has now reviewed the transcript of April's testimony. She testified as follows:

Q.      And so you, then, started to go cash checks, correct?
A.      We had to go pick them up, yes.
Q.      Okay. You had to go pick up -- tell me about that. You got in the car and what happened? A.    He took a picture of my ID and Social Security card.
Q.      Okay.
A.      Sent it to somebody, and then we went to go pick up some checks from some lady.
….
Q.      And so you said that they took a picture of the ID and then you went somewhere?
A.      Yes.
Q.      Where did you go?
A.      To Pontiac and I don't know the other name of the street.
Q.      Okay.
A.      That's where we met somebody and got the checks.
Q.      Who did you meet with over there?
A.      Some lady.
Q.      Okay. Can you give me any information about what the lady looked like?
A.      No, I don't
Q.      What about even just race or –
A.      I believe she was African American.
Q.      Do you have any idea approximate age?

individual parked next to them, returned to the vehicle and handed the checks to the driver. After picking up the checks, they drove to banks outside of Fort Wayne. Rozier would drop April off across or down the street from the bank and April would walk to the bank. (*Id.* at 34). Once inside, April presented the check and her ID for payment. Rozier told her that if the bank asked to verify the check she should walk away. After she received the money, she would return to the vehicle and give the money to the driver. (*Id.* at 36-37). Then, another individual would cash the next check at a different bank. April received $300 for her part on January 13. (*Id.* at 40).

On January 14, April received a text message from the contact she identified as "work" asking if she was "down to work today." (April Day 3 Test. at 42). Rozier picked her up in the same vehicle and she got in the passenger seat. The two then drove to the Rescue Mission to pick up Paul Bennett ("Paul"), who had also been in the van on January 13. (*Id.* at 46). The group went to Sturgis, Michigan to cash checks and then to banks in LaGrange, Indiana. At one point, Paul went into Interra Credit Union in LaGrange to cash a check and things went awry. April testified that she and Rozier, who had driven to a gas station close by, saw Paul talking to a police officer outside the bank. Paul walked away from the bank and, a few minutes later, Rozier and April picked up Paul. Paul got into the driver side passenger seat of the van. (*Id.* at 53). It was at this point that Rozier realized his goose was cooked.

The Government called Officer Eric Patterson ("Officer Patterson") with the LaGrange Police Department who testified that he was dispatched to Interra Bank for a report of a possible fraudulent check. (Officer Patterson Test., ECF No. 226, at 4-5). When he arrived, the bank advised him that Paul was leaving the bank. Officer Patterson contacted Paul outside the bank

---

       A.      No, I don't. She was an older lady I believe.

(April Day 3 Test. at 31-32).

(*id.* at 8), identified him, and spoke with him about the check. Paul voluntarily gave the check he was attempting to cash — a $4,000 check – to Officer Patterson, which he later logged in evidence (*Id.* at 9-11). Officer Patterson decided not to make an arrest; instead, he went to Farmer's State Bank to see if any similar attempts to cash checks had been made. (*Id.* at 14). Learning that no similar attempts had occurred, Officer Patterson left Farmer's State Bank just in time to observe Paul getting into the driver side passenger seat of a maroon-colored vehicle. (*Id.* at 14, 16-17). After briefly losing sight of the vehicle, Officer Patterson reestablished visual contact as he passed the vehicle in his marked squad car. Officer Patterson testified that he immediately turned his car around and witnessed the maroon-colored vehicle pull out in front of oncoming traffic. (*Id.* at 18). He activated his lights and sirens and a vehicle pursuit began. The Government introduced Exhibit 33 which was the dash-cam footage of the pursuit. The video shows papers (torn up checks) being thrown from the vehicle's window as well as the high speeds (115 mph) and reckless driving that ensued.

Meanwhile, April testified that once she saw the police lights and sirens, Rozier began driving at high rates of speed. She states that she was asking Rozier to stop the vehicle. She testified that she also called Derrickal who was yelling at Rozier to stop. The pursuit ended when the maroon van left the roadway and flipped multiple times, ejecting Paul from the vehicle and killing him.

K-9 Officer Tyler Smoker ("Officer Smoker") had been listening to the pursuit on his car radio and responded to assist. (Officer Smoker Test., ECF No. 227, "Officer Smoker Test. at ___"). After the vehicle crashed and came to a stop, Officer Smoker testified that one individual fled from the vehicle into some open fields. (*Id.* at 6). He dispatched his K-9 to pursue the fleeing individual. The individual, later identified by his Georgia identification card as Rozier

(*id.* at 16), stopped his flight after about 200 yards and gave himself up to Officer Smoker. (*Id.* at 7). Officer Smoker's body-cam footage was admitted in evidence and played for the jury.

Officer Smoker explained that after securing Rozier, he talked with the front seat passenger in the crashed vehicle. That person was April. All this testimony was consistent with the Government's theory of the case that April had participated in check cashing on April 13 and 14 and it was Rozier that had obtained the fraudulent checks, recruited individuals to cash them, and driven them to the various banks for that purpose.

### b. Detective Nicholas Martin and the Third Interview of April McBride

The trial took yet another turn during Detective Nicholas Martin's cross-examination on the third day of trial. (Day 3 Trial Tr., ECF No. 216, "Day 3 Tr. at ___.") During defense counsel's examination, Detective Martin revealed for the first time that he interviewed April in March 2022.[3] He testified April's attorney, case agents, and the assistant United States Attorney were also present. (*Id.* at 169). In that interview April disclosed that she had interacted with unknown members of the scheme and exchanged checks in a Family Dollar parking lot. Prior to Detective Martin's testimony, the defense was provided with reports of law enforcement interviews with April in January 2022, neither of which contained any mention of a Family Dollar, the check exchange, or the existence of another vehicle. The defense had not received any reports about this third meeting and Detective Martin testified that he did not prepare a report of that meeting and he did not take notes. (*Id.* at 169-170, 175).

After the Government rested, the defense made motions under Fed. R. Cr. P. 26.2 and the Jenck's Act, seeking any statements from the March 2022 interview. The defense also made an

---

[3] During oral argument, the Government represented that the actual date of the interview was April 2, 2022. However, information has since been provided to show that the interview occurred on April 25, 2022. (ECF No. 300 at 1). The Court refers to the meeting as either the March 2022 meeting or "the third meeting" to avoid confusion with April McBride's name.

oral Motion for Judgment of Acquittal under Fed. R. Cr. P. 29. (Day 3 Tr. at 219). In response to these motions, the Government responded that there were no "statements" as that term is defined under the Jencks Act and that the Government had no "notes" in its possession. The Court took both motions under advisement, permitted the defense time to file a formal written motion, and informed the parties that they would be allowed to supplement the record. (*Id.* at 230). Additionally, the defense requested, and the Court permitted, the defense to file any motion for a mistrial based on an alleged *Brady* violation. (*Id.* at 231). That evening Defendant filed a formal written motion and included a motion for new trial based on an allegation that the Government failed to provide exculpatory information under *Brady*. (ECF No. 160).

The next day, the Court heard argument on the Defendant's motions. (Oral Argument Tr., ECF No. 194). Repeatedly, Government counsel represented that neither she nor any of the Government agents had notes or reports of the third meeting. As for *Brady*, the Government's position was that the information learned from Detective Martin was not exculpatory in any way and even if it was, there was no violation because the information had been disclosed in time for the defense to use it to impeach April's testimony. The Court kept all motions under advisement, the defense rested, and the case was given to the jury. The jury convicted Rozier on all counts. (ECF No. 166).

### c. *Post-trial Information*

The parties then briefed the various post-trial motions. Before the Court could rule on them, Rozier went to trial on his pending state court charges related to the car accident. During his state proceedings, it emerged that Detective Martin had written supplemental reports in which he had, in fact, documented the third meeting he had with April. (Gov't Brief at 4, ECF No. 274). Detective Martin provided his report, consisting of 36 pages, to the Government. Upon its

9

review, the Government represented to the Court that it had not been in possession of the last 7 pages of the report at the time of Rozier's federal trial. Even so, the Government conceded that reports written by Detective Martin fall within the Jencks Act and Rule 26.2 and provided the new pages of the report to the defense. The report states:

> On 4/25/2022 [law enforcement] met with [Ms.] McBride who provided a general review of previously provide[d] information as well as new information that on 1/13/2022 Rozier had driven with her to the Family Dollar on the corner of McKinnie St and Anthony St. in Fort Wayne where he parked facing the building on the south side of the entrance to the Family Dollar and met with someone who provided Rozier the checks they later attempted to and succeeded in cashing. I made contact with the staff who advised they would have the manager contact me when she was available.

(ECF No. 274-1, p. 1).

> The report also summarized an interview of co-defendant Christopher Cass:

> On 5/26/2022 we met with Christopher Cass in regard to his involvement in the passing of the fraudulent checks. Cass advised that on 1/13/2022 he was approached by two black males in a dark Dodge Stratus outside the Fort Wayne Rescue Mission. He advised that the males asked if he wanted to "make some money." He stated that the males later advised him to meet at the BP gas station across from the Mission later in the day.

> Cass advised that he met the males later who were driving a dark Chrysler Town and Country minivan at the BP. He additionally noted that there was another male, who he later identified as the same male he was on camera with at the Topeka Farmers' State Bank branch, as well as heavy set black female with longer black hair. He advised that they all drove to a residence he identified as a two-story home with brick front on Lillie St. in Fort Wayne. He later identified the residence via google maps at Lillie St. at the corner of Baxter St.

> He advised that once at the residence the female exited the back seat and returned with 8-12 printed checks, 4 of which Cass believed had his name on them. We provided all the checks which had been passed on 1/13/2022 and he confirmed that he had never worked for or been owed money by any of the business or people from whom the checks had been written. He additionally advised that he endorsed the checks but did not sign the front of the checks or fill the checks out.

> Cass advised that he had not communicated with anyone in the vehicle other than verbally in the vehicle. He stated that there were never any phone calls or texts sent between anyone him [sic] and anyone in the vehicle. Cass advised that the female provided the checks to the driver who later gave Cass the printed checks

once they arrived at a bank. Cass advised that he attempted and successfully passed four checks on 1/13/2022.

Cass advised that if he were questioned about the checks he should get the check back and come back to the vehicle. Cass advised that the driver told him he would get 10% of the money from the checks he cashed. He also advised that once they had completed passing the fraudulent checks they drove him back to the Fort Wayne Mission and gave him $300 and told him to get out of the car, which he did.

(*Id.* at 2).

The revelation of the above information led to additional briefing as to the materiality of the information and whether the suppression of this information prejudiced the Defendant's trial. The Court turns now to the various motions.

### d. *Legal Standards*

#### 1. **Federal Rules of Criminal Procedure 29 and 33**

Federal Rule of Criminal Procedure 29 allows a defendant to challenge the evidence after the close of the government's case, or after the close of all evidence, as "insufficient to sustain a conviction." Fed. R. Crim. P. 29(a); *United States v. Kohli*, 847 F.3d 483, 489 (7th Cir. 2017). The Court will only overturn the jury's verdict if "after viewing the evidence in the light most favorable to the government, the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Wrobel*, 841 F.3d 450, 454 (7th Cir. 2016) (citation omitted). "When challenging a conviction based on sufficiency of the evidence, a defendant bears a 'heavy' burden that is 'nearly insurmountable.'" *Kohli*, 847 F.3d at 489 (citation omitted).

Federal Rule of Criminal Procedure 33 allows "a district court to grant a timely request for a new trial 'if the interest of justice so requires.'" *United States v. O'Malley*, 833 F.3d 810, 811 (7th Cir. 2016) (quoting Fed. R. Crim. P. 33(a)). The Court should only grant a new trial if the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of

justice to let the verdict stand," *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (alteration in original) (citation omitted), or "if there is a reasonable possibility that [a] trial error had a prejudicial effect on the jury's verdict," *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019). "The ultimate inquiry is whether the defendant was deprived of a fair trial." *United States v. Friedman*, 971 F.3d 700, 713 (7th Cir. 2020) (citation omitted).

### 2. Discovery

Discovery in criminal cases arises from the Due Process Clause, Federal Rules of Criminal Procedure 16 and 26.2, and the Jencks Act, 18 U.S.C. § 3500. Criminal defendants are entitled to disclosure of exculpatory evidence from the Government that is material to the defendant's case. *Brady*, 373 U.S. at 87 ("suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."). *Brady* established a criminal defendant's right to exculpatory evidence that has a reasonable likelihood of affecting the outcome of the case as to guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 675 (1985). In *Giglio v. United States,* the Supreme Court expanded the scope of the mandatory disclosures under *Brady* to include favorable material evidence relating to the credibility of a witness. 405 U.S. 150, 154–55 (1972) (finding that when key witness's credibility was "an important issue in the case ... evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it"). A defendant's right to discovery under *Brady* and *Giglio* is limited to what is required for a fair trial; it does not create a general right to discovery of exculpatory or other evidence. *Bagley*, 473 U.S. at 675 ("The prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."); *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one.").

Along with *Brady* and *Giglio* disclosures, Rule 26.2 and the Jencks Act, 18 U.S.C. § 3500, require production of a witness's statements once that witness has testified on direct examination. Jencks provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement of the witness in the possession of the United States which relates to the subject matter as to which the witness testified." 18 U.S.C.§ 3500(b); Fed. R. Cr. P. 26.2(a).

e.   ***Analysis***

1.   **Motion for Judgment of Acquittal**

Defendant was convicted of five counts of bank fraud (18 U.S.C. §1344), corresponding to the odd counts of the superseding indictment and five counts of aggravated identity theft (18 U.S.C. §1028A), corresponding to the even counts of the superseding indictment. Rozier contends that the evidence at trial could not sustain a conviction on any of the counts. The Court will address each category of offenses individually.

i.   *Bank Fraud (Counts 1, 3, 5, 7, and 9)*

The relevant counts are as follows:

- Count 1 charged Rozier with knowingly executing a scheme intending to defraud Farmer's State Bank on January 13, 2022, by assisting in the check cashing of altered check #1406 made payable to April McBride in the amount of $1,490.50;

- Count 3 charged Rozier with knowingly executing a scheme intending to defraud Farmer's State Bank on January 13, 2022, by assisting in the check cashing of altered check #5411 made payable to P.B. in the amount of $5,845.98;

- Count 5 charged Rozier with knowingly executing a scheme intending to defraud Lake City Bank on January 13, 2022, by assisting in the check cashing of altered check #32059 made payable to P.B. in the amount of $3,822.46;

- Count 7 charged Rozier with knowingly executing a scheme intending to defraud Farmer's State Bank on January 14, 2022, by assisting in the check cashing of altered check #5425 made payable to April McBride in the amount of $4,921.25; and

- Count 9 charged Rozier with knowingly executing a scheme intending to defraud Farmer's State Bank on January 14, 2022, by assisting in the check cashing of altered check #1847 made payable to P.B. in the amount of $1,700.00.

(Superseding Indictment, ECF No. 117).

To prove the Defendant guilty of bank fraud, the government had to prove these elements beyond a reasonable doubt: (1) that there was a scheme to defraud a bank; (2) that the defendant knowingly executed or attempted to execute the scheme; (3) that the defendant acted with an intent to defraud; (4) that the scheme involved a materially false or fraudulent pretense, representation, or promise; and (5) that at the time of the offense, the Federal Deposit Insurance Corporation ("FDIC") insured the deposits of the bank. (ECF No. 165, Instruction No. 19; Seventh Circuit Pattern Criminal Jury Instructions at 635). Intent to defraud requires proof that the defendant "act[ed] knowingly with the intent to deceive or cheat the victim in order to cause a gain of money or property to the defendant or another, or the potential loss of money or property to another." *United States v. Faruki*, 803 F.3d 847, 853 (7th Cir. 2015). A "scheme" is a plan or course of action formed with the intent to accomplish some purpose. A scheme to defraud a bank or financial institution is a plan or course of action that is intended to deceive or cheat that bank or financial institution to obtain money or property or to cause the potential loss of money or property belonging to, in the care, custody, or control of the bank or financial institution." (ECF No. 165, Instruction 23).

Rozier contends that the evidence presented at trial could not demonstrate he knew about the alleged bank fraud. The Court need not expend significant time on this argument as the record overflows with evidence from which a jury could have found that Rozier knew he was participating in a scheme to defraud banks. At trial, the Government meticulously produced evidence of the scheme to defraud. As the evidence came in, there was overwhelming evidence

14

that Rozier knew about the bank fraud, participated in it, and recruited others to assist in the fraudulent plan. The Motion for Judgment of Acquittal on counts 1, 3, 5, 7, and 9 is DENIED.

> ii.    *Aggravated Identity Theft (Counts 2, 4, 6, 8, and 10)*

Turning next to the aggravated identity theft counts, the relevant counts are as follows:

- Count 2 charged Rozier with knowingly using the name and account number of Richard Bontrager without lawful authority on January 13, 2022, on forged and altered check #1403, during and in relation to bank fraud;

- Count 4 charged Rozier with knowingly using the name and account number of Kenneth Otto without lawful authority on January 13, 2022, on forged and altered check #5411, during and in relation to bank fraud;

- Count 6 charged Rozier with knowingly using the name and account number of Rodney Parker without lawful authority on January 13, 2022, on forged and altered check #32059, during and in relation to bank fraud;

- Count 8 charged Rozier with knowingly using the name and account number of Kenneth Otto without lawful authority, on January 14, 2022, on forged and altered check #5425, during and in relation to bank fraud;

- Count 10 charged Rozier with knowingly using the name and account number of Janelle Petersheim without lawful authority on January 14, 2022, on forged and altered check #1847, during and in relation to bank fraud.

(Superseding Indictment, ECF No. 117).

To find the Defendant guilty of aggravated identity theft, the Government had to prove beyond a reasonable doubt that the Defendant (1) committed the felony offense of bank fraud; (2) knowingly used a means of identification; (3) knew the means of identification belonged to another person; (4) knew that such use was without lawful authority; (5) did so during and in relation to bank fraud; and (6) at the time of the charged offense the deposits of the bank or financial institution were insured by the Federal Deposit Insurance Corporation. (ECF No. 165, Instruction 20).

15

Again, the Court has little qualms denying the Defendant's motion. For each of these counts, the Government more than met its burden to produce facts from which a reasonable jury could find all the elements of the aggravated identity theft offenses. The Government set forth facts to show that Rozier committed or assisted in the commission of bank fraud, each of the specific Victims in each count testified that their name and account numbers were utilized without their authority; the Government produced evidence that Rozier provided the Cashers with the fraudulent checks and testimony showing that Rozier knew he was using the identities of others to defraud the banks. The Motion for Judgment of Acquittal as to counts 2, 4, 6, 8, and 10 is DENIED.

### 2.    <u>Motion for New Trial based on Discovery Violations</u>

That resolution leads the Court to the more serious concern raised by the Defendant – that is whether the Government's admitted discovery violations warrant a new trial. To obtain a new trial Rozier must show that the evidence is "(1) favorable, (2) suppressed, and (3) material to the defense." *United States v. Johnson*, 43 F.4th 771, 783 (7th Cir. 2022). The Government concedes it violated the Jencks Act by failing to disclose Det. Martin's supplemental narrative reports that included his summary of April's third interview and information about an interview with Cass. As for a *Brady* violation, the Government argues that none of the materials suppressed were favorable and material to the defense. The Court turns to these arguments.

Evidence is favorable if it is either exculpatory or impeaching. *Turner v. United States*, 137 S.Ct. 1885, 1893 (2017). But "[e]vidence need only have 'some weight' or 'tendency' to be favorable to the defendant." *United States v. Ballard*, 885 F.3d 500, 504 (7th Cir. 2018) (quoting *Kyles v. Whitley*, 514 U.S. 419, 455 (1995)). The Government contends that none

of the non-disclosed materials constitute *Brady* material[4] because the non-produced materials have only "minimal impeachment value." (ECF No. 274 at 6).

Rozier disagrees and identifies several categories of evidence that he contends were both suppressed and material. The first category is information about the third meeting with April where she provided "new" information. **The second category is** a previously undisclosed interview of co-conspirator Cass where he provides information that he was driven to an address on Lillie Street in Fort Wayne, IN and a "heavy set black female with long hair" entered the house and returned with 8-12 fraudulent checks – facts Detective Martin denied knowing on cross-examination. Finally, Rozier identifies information about a Verizon Wireless search warrant return for Jamison Braden ("Braden"), who had passed fraudulent checks on January 12, 2022 – the day before the events in the superseding indictment. Information from that warrant return connected Braden and Rozier to an individual named Rose K. Williams ("Williams").

As Rozier views it, the defense was deprived of the opportunity to investigate the facts in the supplemental report; they could not develop a cross-examination of Detective Martin aided by these facts and they could not impeach April's testimony with the new information in the report. Likewise, the defense argues that the undisclosed information prevented them from looking further into Braden and investigating the role Williams may have played in the scheme. Had the defense known this information, it may have altered their trial strategy and the way they cross-examined key witnesses like April.

The Government charged Rozier, in essence, with two days of activities involving bank fraud and identity theft. The key piece of evidence linking Rozier to these activities on January 13, 2022, was April's testimony. She was the only witness to put Rozier in the van as the driver

---

[4] The Government concedes that the non-disclosed information constitutes both a Jencks Act violation and a Rule 26.2 violation. (ECF No. 274 at 6).

on that day and, in the Court's view, her credibility was key to the jury's assessment of whether Rozier participated in the criminal activities for which the Government charged him, at least on that date. This is particularly critical because the evidence presented to the jury implicated other unnamed individuals in the scheme and the undisclosed evidence mentions individuals other than Rozier. These unidentified individuals were in vehicles that were different than the maroon van April testified Rozier was driving. For example, the newly disclosed summary of Cass' interview indicates that on January 13 he was approached at the Rescue Mission by two black males in a Dodge Stratus. Later, he indicated he was picked up by two black males in a dark Chrysler Town and Country minivan. At no point in the interview is Rozier (or anyone else) identified as the driver by Cass. When taken in tandem with April's inability on direct examination to identify Rozier as the driver, this new evidence carries "some weight" in defendant's favor – indeed it calls into question whether Rozier was the driver on January 13 – and clears the "favorability" hurdle.[5]

That leaves materiality. The standard for materiality is whether there is "a reasonable probability" that the outcome would have been different if the evidence had been disclosed. *United States v. Walter*, 870 F.3d 622, 630 (7th Cir. 2017). "A 'reasonable probability' of a different result is shown when the government's suppression of evidence 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). The Court does "not need to find, however, that 'but for' the failure to disclose...the defendant would not have been convicted." *Id.* The Court need only decide whether there is a reasonable probability of a different outcome and whether the undisclosed information undermines the confidence in

---

[5] The Court agrees with the Government that that the new information has less import for the January 14, 2022 counts. It is difficult for Rozier to deny his participation on that date when officers arrested Rozier on the scene after he fled from police and crashed the car. Again, however, April was the sole living witness that could identify Rozier as the driver on that date. Thus, to the extent the information provided impacts how the jury viewed her testimony, the Court finds it clears the favorability hurdle.

the outcome of the trial. The trial judge's factual conclusions about the effect of nondisclosure are entitled to great weight. *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005)

The crux of the Government's case was April's testimony. Without her testimony, the Government had no evidence that Rozier participated in the activities charged in the superseding indictment. No doubt April was a questionable witness. The undisclosed evidence cements this fact. Aside from her dubious identification of Rozier, April testified that once Rozier picked her up, they drove to Pontiac Street where "some lady" gave them the checks. But the new undisclosed information was that Rozier drove them to a Family Dollar and an older black woman (perhaps Rozier's aunt) gave them the checks to cash. Had the defense been able to impeach April with this information, it could have put yet another dent in her credibility. The defense could have benefitted from information if, for no other purpose than to argue to the jury that April lied about who was in the car with her, she lied about where they retrieved the checks they cashed, and she was simply coming up with a story to receive a sentencing benefit for her own conduct. See *Napue v. People of State of Ill.,* 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.").

The new evidence also calls into question Detective Martin's credibility. He insisted at trial that he did not write a report of the third meeting with April. This turned out to be untrue. The defense could not question Detective Martin about the report and the new information it contained because he denied its very existence. The defense argues that having the report would have cast doubt on the government's case, which in turn would have put the whole case in such a different light as to undermine confidence in the verdict.

"Evidence may be material if it could have been used effectively to impeach or corral witnesses during cross-examination." *Johnson v. Folino*, 705 F.3d 117, 129-30 (3d Cir. 2013). District courts consider not only the content of the evidence at issue but also "where it might have led the defense in its efforts to undermine [a particular witness]" when determining whether evidence is "material." *Id.* at 131. The Court is firmly convinced that the undisclosed information was material to the credibility of, at the very least, two witnesses, and the jury was entitled to hear the defense cross-examine April and Detective Martin about the information in the supplemental report. The failure to disclose the supplemental report deprived the jury of that information from which they could have discounted, disregarded or otherwise been skeptical of the Government's key witness and one of its agents.

The Government argues that the trial evidence was so overwhelming that it would still have prevailed even with the disclosed evidence presented. That is one possibility. But the standard is whether the undisclosed evidence creates a "reasonable probability" that the outcome would have changed. Stated another way, the question is whether in the absence of the undisclosed evidence did the defendant receive a fair trial understood as a trial resulting in a verdict worthy of confidence. With the addition of the potentially impeaching information, the jury could have chosen to disregard April's testimony and conclude that the Government had not met its burden beyond a reasonable doubt of showing that Rozier was the driver on January 13, 2022. That there are other plausible explanations or outcomes is immaterial. Certainly, the defense has a tougher showing with respect to the January 14, 2022, conduct but that too, is something that the jury must assess once it has all the information. Simply put, the undisclosed information could make the difference between conviction and acquittal on the ten counts in the

superseding indictment. For this reason, the Court finds that the Defendant was deprived of a fair trial and a new trial is warranted. The Defendant's Motion for a New Trial is GRANTED.

**3.  Constitutionality of 18 U.S.C. §1028(a)(1) as Applied to Rozier**

Finally, the Court denies Defendant's motion to dismiss the aggravated identity theft counts for failing to state an offense. Title 18 U.S.C. § 1028A defines aggravated identity theft as "knowingly transfer[ring], possess[ing], or us[ing], without lawful authority, a means of identification of another person" "during and in relation to" certain felonies, including bank fraud and bank fraud conspiracy.

In *Dubin v. United States*, the Supreme Court clarified what constitutes "use[ ]" of a means of identification "in relation to" a predicate felony under § 1028A(a)(1). 599 U.S. at 114, 131–32. To frame its discussion, the Supreme Court first explained that "'identity theft' has a focused meaning." *Id.* at 122. It stated that identity theft has been defined as "[t]he unlawful taking and use of another person's identifying information for fraudulent purposes; specif[ically] a crime in which someone steals personal information about and belonging to another, such as a bank-account number or driver's-license number, and uses the information to deceive others." *Id.* (quoting Black's Law Dictionary 894 (11th ed. 2019) (defining "identity theft") (brackets in original)).

Against this backdrop, the *Dubin* Court explained that:

A defendant "uses" another person's means of identification "in relation to" a predicate offense when this use is at the crux of what makes the conduct criminal. To be clear, being at the crux of the criminality requires more than a causal relationship, such as "'facilitation'" of the offense or being a but-for cause of its "success." ... Instead, with fraud or deceit crimes like the one in this case, the means of identification specifically must be used in a manner that is fraudulent or deceptive. Such fraud or deceit going to identity can often be succinctly summarized as going to who is involved.

599 U.S. at 131-32 (internal citations omitted).

*Dubin* involved a healthcare fraud case pertaining to overbilling, the Court found the "use of the patient's name was not at the crux of what made the underlying overbilling fraudulent;" rather, the "petitioner's fraud was in representing *how* and *when* services were provided to a patient, not *who* received the services." *Id.* at 132. Thus, using the patient's identity was not "in relation to a predicate offense" under the Aggravated Identity Theft statute. *Id.*

Contrary to Defendant's assertions, the Aggravated Identity Theft Counts here meet *Dubin*'s requirement that the identity theft be at the crux of what made the aggravated identity thefts counts fraudulent. In other words, the Superseding Indictment alleged, and the Government proved at trial that Rozier used the identity of the check holders in relation to fraud crimes "in a manner that is fraudulent or deceptive" because it went "to 'who' is involved." *See Dubin*, 599 U.S. at 132 (footnote omitted). Thus, the Court finds that the Defendant's motion to dismiss is not well-taken.

## **CONCLUSION**

For the reasons above, the Court:

- DENIES as MOOT Defendant's Motion for Release of Brady Materials and for Discovery under the Jencks Act (ECF No. 160) and his Supplemental Motion for Release of Brady Materials (ECF No. 217);

- DENIES Defendant's Renewed Motion for Judgment of Acquittal but GRANTS Defendant's Motion for a New Trial under Fed. R. Cr. P. 33 (ECF No. 217);

- DENIES Defendant's Motion Contesting 18 U.S.C. §1028A(a)(1)'s Constitutionality (ECF No. 240); and

- TAKES NO ACTION regarding the Stipulation (ECF No. 322) and the Supplement to the Stipulation (ECF No. 323).

By separate entry, the Court will set this case for a status and scheduling conference.

SO ORDERED on August 22, 2024.

s/ Holly A. Brady
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT